Filed 11/15/13  P. v. Kirby CA4

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| THE PEOPLE, | C070724 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF110853) |
| v. | |
| RICKY DARWIN KIRBY, | |
| Defendant and Appellant. | |

An altercation over deadly threats to a pet cat escalated, leading to a fight between the cat's owner, Brynda Delong, and her brother, defendant Ricky Darwin Kirby. Defendant's elderly mother, Viola Kirby, entered into the fray and the situation swiftly deteriorated.  An information charged defendant with assault, dissuading a witness from testifying, threatening to commit a crime that would result in the infliction of great bodily injury on another, and elder abuse.  (Pen. Code, §§ 245, subd. (a)(1), 136.1, subd. (c)(1), 422, 368, subd. (b)(1).)[1]

---

[1]  All further statutory references are to the Penal Code unless otherwise designated.

1

A jury found defendant guilty of all counts except one count of making criminal threats against defendant's mother. Sentenced to 20 years in state prison, defendant appeals, challenging the sufficiency of the evidence to support his conviction for assaulting Brynda and arguing the court erred in instructing on causation. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Officers responded to a call requesting a welfare check at 72-year-old Viola Kirby's residence. After interviewing Viola and her daughter, Brynda Delong, an ambulance was called and Viola was taken to the emergency room.

An amended information charged defendant with assaulting Brynda with force likely to cause great bodily injury (count 1), dissuading a witness from testifying (counts 2 & 3), willfully threatening to commit a crime that would result in the infliction of great bodily injury against another (counts 4 & 5), and elder abuse (count 6). The information also alleged personal infliction of great bodily injury as to counts 1 and 6, and defendant's knowing and malicious use of or threat to use force in the commission of count 2. (§§ 12022.7, subds. (a), (c), 136.1, subd. (c)(1).) In addition, the information alleged defendant had suffered a conviction for a serious and violent felony, and a conviction for a serious felony. (§§ 667, subd. (e)(1), 667, subd. (a), 1192.7, subd. (c).) Finally, the information alleged five prior prison commitments under section 667.5, subdivision (b). Defendant entered a plea of not guilty.

A jury trial followed. The following evidence was introduced at trial.

**The Dispute**

In April 2011 Viola and her adult daughter Brynda lived together in Viola's home. Defendant, Viola's son and Brynda's brother, sometimes stayed in an automotive shop on the property.

Viola, who weighed about 300 pounds, had suffered numerous hospitalizations and suffered from osteoporosis. Viola used a walker at trial.

2

Defendant helped Viola with chores around the house.  He helped her with medical care, made sure she had adequate food, and cleaned her portable toilet.

**The Incident**

On April 17, 2011, Viola, wrapped in a towel and preparing to shower, talked to defendant in her bedroom.  Brynda's 15-year-old cat had annoyed defendant, and defendant threatened to smash the cat's head in.  Defendant's remarks upset Viola, who relayed the threat to Brynda.  Viola told Brynda she should talk to defendant.

Brynda went outside to talk to defendant, who was accompanied by a friend, Byron Ellison.  Twice Brynda asked to speak with defendant, but he did not reply.  Instead, defendant walked away.  Brynda told defendant that if her cat turned up dead, she would report him to the police for animal cruelty.

Brynda saw a knife on the driveway and picked it up.  She took the knife into the house.  Brynda described the knife as larger than a steak knife; Ellison described it as a large kitchen knife.

Brynda joined Viola in her mother's bedroom.  Viola asked Brynda if she had talked with defendant.  Brynda put the knife on the bed.

Defendant suddenly entered the bedroom and attacked Brynda from behind.  He choked Brynda until she could no longer breathe.

Brynda grabbed the knife, but defendant wrested it from her.  Defendant held the knife to Brynda's throat and said " 'I ought to.' "  As the pair struggled, Brynda fell off the bed and hit a metal trunk on the floor.  The fall injured her ribs.[2]

Brynda tried to get out of the bedroom, but defendant grabbed her.  Defendant pulled Brynda's hair and called her a "nigger bitch."  Defendant picked her up and threw

---

[2]  Brynda did not seek medical treatment for her ribs.  She had previously broken ribs in an auto accident and learned there was no treatment for broken ribs.  Since Brynda's ribs hurt in the same way after her fall from the bed, she believed her ribs were broken.

her into the closet doors.  The impact knocked the doors off their runners and knocked down the curtain rod.

Brynda curled into a ball on the floor, screaming for help.  She told defendant he was hurting her.  Defendant replied:  "[G]ood.  I want you to be scared of me.  Good.  I want to hurt you."

Defendant threatened to kill Brynda and Viola if they contacted the police.  Defendant smashed his boot into some dog feces on the floor and smeared it onto Brynda's pants.  He kicked Brynda more than five times.

Defendant picked up or kicked Viola's bedside commode and spilled its contents onto her clothes on the floor.  Viola asked him to clean up the mess and defendant said, " 'This nigger bitch can clean it up,' " referring to Brynda.  He grabbed Brynda by the head or hair and dragged her across the mess on the floor, causing rug burns on her arm.

Viola grabbed her dog's leash and hit defendant.  Brynda heard Viola scream.  Brynda got up and ran to a neighbor's house.  She called her daughter and told her she would be unable to come to a barbeque at her daughter's house that day.  Her fear of defendant prevented her from calling the police.

At trial, Viola testified that she loved defendant and would "take a bullet for him."  She denied witnessing defendant's attack on Brynda.  Viola testified that when defendant entered the room, she was unable to see him or Brynda.  Viola thought defendant might have said he felt like killing Brynda, but she did not hear him threaten to kill Brynda.

Viola did not recall her statements to officers following the incident.  In her previous statement, she told officers defendant hit, punched, and threw Brynda around the bedroom.  Viola also stated defendant threw her to the floor and she tried to defend herself by hitting him with a dog leash.

Nor did Viola remember any conversations with defendant while he was in jail.  She denied the substance of those conversations when they were described to her.  Viola testified she hit defendant with a dog leash "to stop" the "hitting."  She fell when

4

defendant grabbed the leash out of her hand, pulling her off balance. Viola testified that Brynda did not use the knife against defendant, did not threaten him, and did not fight back.

Ellison remained outside during the altercation. Ellison testified that Brynda threatened to kill defendant after he slapped the cat off the bed and told his dog to get the cat. In addition, Ellison told defendant that Brynda had a knife and had threatened defendant's life, but he failed to mention this to the police. He heard arguing and screaming from inside the house, lasting about 30 minutes. Ellison also heard objects hitting a wall. Defendant eventually came out of the house and said he was leaving.

Brynda returned to the house and found Viola on the floor next to her bed. Viola complained of pain but did not want defendant to be arrested. She told Brynda not to summon medical help.

**The Investigation**

When Sheriff's Deputy Kimber Anderson responded to a call requesting a welfare check at Viola's house, Brynda answered the door. Deputy Anderson found Viola lying on the bedroom floor. Viola seemed upset and became emotional when questioned by Deputy Anderson. She was distracted but did not appear to be under the influence of any substance.[3]

Viola told Deputy Anderson that defendant hit, punched, and threw Brynda around the bedroom. Viola told him to stop, but defendant continued beating Brynda. Defendant picked Viola up and threw her to the floor. She tried to hit him with a dog leash to stop the attack. Viola said defendant told her he would have killed Brynda if Viola had not been there. Viola feared calling the police because defendant threatened to come back and kill her and Brynda if she did.

---

[3] Deputy Anderson testified she was trained to recognize when a person is under the influence, and Viola did not appear to be so the day of the incident.

Brynda told Deputy Anderson that defendant had choked her, pushed her, and thrown her. Brynda had a scrape on her elbow, and a bruise and redness on the back of her arm. Anderson found no signs of injury to her stomach, ribs, or neck. Her pants were stained with dog feces. Anderson noticed the closet doors were off their tracks and the curtains off their rod.

Viola spent several days in the hospital, followed by several weeks in a skilled nursing facility. Viola told the treating physician at the hospital that defendant threw her and she injured her knee. Her injuries were consistent with her story. The physician described Viola as distraught but not confused. She was alert, cooperative, and pleasant.

**Jailhouse Visits and Telephone Calls**

Defendant's jailhouse visits and telephone calls were tape recorded. The jury heard the tapes at trial.

A few days after the incident, on April 22, 2011, Brynda and defendant spoke over the phone. Brynda told defendant she feared she was "going to die at, in [his] hands." She said she had broken ribs and it hurt to breathe. Defendant responded that he had only shaken Brynda. She said she had a bruise on her thigh the size of defendant's foot.

They spoke again by phone about 15 minutes later. Brynda told defendant that when officers arrived after the attack, Viola "broke down because [she] didn't want to call on you." Brynda did not want to call the police "because you threatened me you'd kill me and I believe that." Defendant said he had threatened her to prevent her from calling the police, since "You just don't understand what it's like being locked up . . . ."

On April 27, 2011, defendant spoke with Ellison by phone. Defendant told Ellison he needed to say Brynda attacked defendant. Ellison said he remembered Brynda picking up the knife and threatening defendant the day of the incident.

On May 12, 2011, defendant spoke to Viola by telephone. Viola mentioned a broken leg and defendant expressed no knowledge of the cause. Viola responded: "You don't know who did that? You don't know that you picked me up by that arm and threw

6

me on the floor?" Defendant said, "Okay." Viola also said defendant had thrown her to the floor, breaking her leg. Defendant denied doing so, claiming Viola fell. Viola told him he was digging a bigger grave for himself by lying.

Defendant denied throwing Viola to the floor and accused her of being on "really good meds." Viola denied defendant's claim that she had fallen. She also said defendant had done "all that other stuff . . . with the dog poop and all that kind of stuff."

On July 15, 2011, Viola again spoke with defendant by telephone. Defendant denied kicking Brynda, but Viola insisted he had kicked her when she was in a corner. Defendant said he picked up Brynda and denied hitting her. He subsequently claimed he picked up Brynda and dropped her and shook her.

The pair spoke again on July 31, 2011. Defendant said they needed to discuss Viola's trial testimony. He told Viola that Brynda had threatened him with a knife and they fought. He denied hitting Brynda and said he kept picking her up. Viola stated defendant had struck and choked Brynda. Defendant told Viola he would be in trouble if Viola told that story. Instead, defendant said Viola was lying on the ground and could not see what happened.

The two discussed Viola's testimony again on August 13, 2011. Defendant told Viola to testify that he was incapable of picking her up. Viola fell when she hit him with a dog leash. Brynda and defendant fought after Brynda brought the knife into the house. She threatened to cut defendant's throat on the driveway. Defendant said he could not take his sister's threat seriously, but Viola said Brynda was afraid of defendant so she was moving.

About a week later, defendant and Brynda discussed her proposed trial testimony. Defendant said he had thrown Brynda's cat out before she came into the bedroom with a knife. However, Brynda said she was in the room when he entered and the knife was on the bed. Defendant came into the room, choked her, and threw her on the bed. It was then that Brynda picked up the knife. Defendant told Brynda she could not say that, but

7

she insisted that is what happened. Defendant said such testimony would send him to prison for a long time.

Defendant told Brynda he needed her to claim that she grabbed the knife and threatened him for hurting her cat. He said there would be no case against him if she gave that testimony. Defendant urged Brynda to "[l]isten to what I told you, try to keep that in your head." Brynda said that would be lying. Defendant asked her to trust him and that this would never happen again. He told Brynda to testify as he had outlined.

**Defense Case**

Defendant did not testify or call any witnesses.

**Verdict and Sentencing**

The jury acquitted defendant on count 4, making criminal threats against Viola, and convicted him on all other counts. The jury found not true the personal infliction of great bodily injury as to count 1, and found both the personal infliction of great bodily injury as to count 6 and the knowing and malicious threat to use force in the commission of counts 2 and 3 to be true. A court trial on the bifurcated priors found them to be true.

The court sentenced defendant to 20 years to life in state prison: the three-year midterm on count 6, doubled under section 667, subdivision (e)(1), plus five years for the section 12022.7, subdivision (c) enhancement, to run consecutively to the term for count 6; plus the three-year midterm for count 1, doubled under section 667, subdivision (e)(1), to run concurrently with the term for count 1; plus the three-year midterm on count 2, doubled pursuant to section 667, subdivision (e)(1), to run concurrently with the term for count 6; plus the three-year midterm on count 3, doubled pursuant to section 667, subdivision (e)(1), to run concurrently with the term for count 6; plus the two-year midterm on count 5, doubled pursuant to section 667, subdivision (e)(1), stayed pursuant to section 654; plus five years for the section 667, subdivision (a) and section 1192.7, subdivision (c) enhancements, to run consecutively to the term for count 6; plus four years (one year, to be served consecutively, for each of the

8

four section 667.5, subdivision (b) priors) to run consecutively to the term for count 6. The trial court stayed the section 667.5, subdivision (b) prior for the January 30, 2006, conviction for violating section 422. Defendant filed a timely notice of appeal.

## DISCUSSION

### Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence supporting his conviction of assault by force likely to produce great bodily injury. According to defendant, the evidence supporting the conviction lacked sufficient probative value, and a reasonable jury could not have found guilt beyond a reasonable doubt given the "vast gap between the ferocious fight" Brynda described and Brynda's actual injuries.

In reviewing a defendant's challenge to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence. Substantial evidence is evidence that is credible, reasonable, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

We do not reassess the credibility of witnesses, and we draw all inferences from the evidence that supports the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.) Unless it is physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) If substantial evidence supports the verdict, we defer to the trier of fact and do not substitute our evaluation of witness credibility for that of the jury. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) If the record supports the jury's findings, our belief that the circumstances might also reasonably support a contrary finding does not warrant a reversal of judgment. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

Great bodily injury is injury that is significant or substantial, not insignificant, trivial, or moderate. (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.) Circumstances and conditions a reasonable jury may consider in determining whether the

9

force used was likely to cause great bodily injury include (1) the characteristics of both the victim and the defendant, (2) the characteristics of the location where the abuse took place, (3) the potential response or resistance of the victim to the abuse, (4) any injuries actually inflicted, (5) pain sustained by the victim, and (6) the amount of force exerted by the defendant. (*People v. Clark* (2011) 201 Cal.App.4th 235, 245.)

In challenging the sufficiency of the evidence, defendant focuses in on "the admitted lies and glaring inconsistencies in the prosecution's evidence, highlighted by Brynda's and Viola's testimony, [which] made the evidence inherently improbable." Specifically, defendant paints Brynda's and Viola's testimony as improbable and physically impossible.

According to defendant, Brynda admitted making false statements to the police five days after the incident, specifically blaming defendant for loosening her teeth and claiming defendant lifted her one foot off the ground. However, this argument completely ignores the graphic, detailed testimony Brynda gave at trial and to officers responding to the scene.

Brynda testified defendant choked her until she could not breathe, threw her against the closet doors, kicked her, smeared her with dog feces, grabbed her by the hair, and dragged her across the floor. This testimony differs greatly from the testimony in *People v. Duke* (1985) 174 Cal.App.3d 296 cited by defendant. In *Duke*, the defendant put the victim in a headlock while touching her breast. The headlock was momentary, and the defendant did not cut off the victim's airway or choke or strangle her. The only injury to the victim was a slight laceration to her earlobe from her earring being pushed against her ear. (*Id*. at p. 302.) The court found insufficient evidence to support a conviction for assault with force likely to produce great bodily injury since the victim "was in no danger from the force actually exerted on her body." (*Id*. at p. 303.)

Here, in contrast, defendant choked Brynda until she could not breathe. He threw her against the closet with sufficient force to dislodge the doors from their runners.

10

While Brynda curled into a fetal position on the floor, defendant kicked her and smeared her pants with dog feces. Defendant grabbed Brynda by the hair and dragged her along the floor into the urine-soaked pile of clothes. This evidence supports the jury's finding of force likely to produce great bodily injury.

Nor are we convinced by defendant's attempts to undermine Viola's statements to officers at the scene. Defendant argues Viola's testimony at trial was unreliable because she suffered from hallucinations from medication. Viola did testify that her medications left her confused and disoriented. However, the physician who treated Viola in the emergency room the night of the incident testified that she was distraught but not confused and did not appear to be in an altered mental state. The officer who responded to the scene also described Viola as distracted, as though she had been through something traumatic. The officer, who had been trained to recognize whether someone was under the influence, testified Viola was not under the influence that night when she described defendant's attack on Brynda.

Finally, defendant argues Brynda's injuries were totally inconsistent with her story of the assault. The officer noted and photographed the rug burn on Brynda's elbow and redness on her upper arm. Since bruising can appear some time after the injury, the officer asked Brynda to contact her if she subsequently developed bruises. She never heard from Brynda. Defendant contends these relatively trivial injuries do not comport with the horrific assault described by Brynda and Viola.

The injury suffered by the victim is but one consideration in determining whether an assault was committed with force likely to produce great bodily injury. Brynda testified her ribs were injured and her arms and ribs were bruised. The damage to Viola's bedroom reflected the violent physical altercation described by both Viola and Brynda. We find the evidence sufficient to support defendant's conviction for assault with force likely to cause great bodily injury.

11

## Instructional Error

Defendant also faults the trial court's instruction on causation in the context of the great bodily injury enhancement attached to the elder abuse charge. Defendant argues the instruction confused and misled the jury.

**Background**

Prior to instructing the jury on the crimes and enhancements, the trial court gave a general causation instruction: "An act causes injury if the injury is the direct, natural, and probable consequence of the act and the injury would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] There may be more than one cause of injury. An act causes injury only if it is a substantial factor in causing the injury. A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor that causes the injury." (CALCRIM No. 240.)

As to count 6, elder abuse, the court instructed: "The defendant is charged in Count 6 with elder abuse in violation of Penal Code section 368(c). [¶] To prove the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully inflicted unjustifiable physical pain or mental suffering on Viola Kirby; [¶] 2. Viola Kirby was an elder; [¶] and [¶] 3. When the defendant acted, he knew or reasonably should have known that Viola Kirby was an elder. [¶] Someone commits an act willfully when he or she does it willingly or on purpose. [¶] An elder is someone who is at least 65 years old. [¶] Unjustifiable physical pain or mental suffering is pain or suffering that is not reasonably necessary or is excessive under the circumstances." (CALCRIM No. 831.)

In conjunction with the section 12022.7 enhancement, the court instructed: "If you find the defendant guilty of the crimes charged in Counts 1 or 6, you must then decide whether, for each crime, the People have proved the additional allegation that the

12

defendant personally inflicted great bodily injury on someone else in the commission of that crime. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] The defendant must have applied substantial force to the injured person. If that force could not have caused or contributed to the great bodily injury, then it was not substantial. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (CALCRIM No. 3160.)

In addition, the court instructed: "If you find the defendant guilty of the crime charged in Count 6, you must then decide whether the People have proved the additional allegation that the defendant personally inflicted great bodily injury on someone who was 70 years of age or older. [¶] To prove this allegation, the People must prove that: [¶] 1. The defendant personally inflicted great bodily injury on Viola Kirby during the commission of the crime; [¶] and [¶] 2. At that time, Viola Kirby was 70 years of age or older. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] The defendant must have applied substantial force to Viola Kirby. If that force could not have caused or contributed to the great bodily injury, then it was not substantial. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (CALCRIM No. 3162.)

**Discussion**

The court must instruct, even in the absence of a request, on the general principles of law relevant to the issues raised by the evidence. These general principles refer to those principles closely and openly connected with the facts before the court and that are necessary to the jury's understanding of the case. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715.)

13

Defendant argues the court erred in failing to give sua sponte additional guidance for applying the "personally inflict standard." As a consequence, the jury may have improperly applied the proximate causation instruction to the personal infliction of great bodily injury enhancement.

To find a defendant personally inflicted injury, the jury must find the defendant directly caused the injury. Such a finding requires more than proximate causation. (*People v. Rodriguez* (1999) 69 Cal.App.4th 341, 346-347; *People v. Cross* (2008) 45 Cal.4th 58, 68.)

Here, the court instructed the jury that it must find defendant personally inflicted great bodily injury. The court gave the proximate cause instruction prior to all the instructions on the charged crimes. Defendant fails to explain why the jury would apply the proximate cause instruction to the section 12022.7 enhancement when the court unambiguously instructed that the enhancement required a finding that defendant personally inflicted the injury. Nor did defendant object or request additional instructions on the enhancement. We find no error.

## DISPOSITION

The judgment is affirmed.


                                                      RAYE            , P. J.



We concur:



        HULL            , J.



        MAURO          , J.

14